UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

WILLIAM J. EINHORN,
Administrator of THE TEAMSTERS
PENSION TRUST FUND OF
PHILADELPHIA & VICINITY,

        Plaintiff,

   v.

J&S, INC., BRISTOL
CONSOLIDATORS, INC., GHAZNAVI
INVESTMENTS, INC., G&G
INVESTMENTS, INC., and JOHN J.
GHAZNAVI,

        Defendants,

   v.

ECKERD CORPORATION d/b/a
BROOKS/ECKERD CORPORATION,

        Third-Party Defendant.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 07-4537(JEI)

**OPINION**

**APPEARANCES:**

THORP REED & ARMSTRONG, LLP
  By: Barry L. Cohen, Esq.
993 Lenox Drive, Suite 200
Lawrenceville, NJ 08648
    Counsel for Defendants J&S, Inc., Bristol Consolidators,
    Inc., Ghaznavi Investments, Inc., G&G Investments, Inc., and
    John J. Ghaznavi

LITTLER MENDELSON, P.C.
  By: David I. Rosen, Esq.
One Newark Center, 8th Floor
Newark, NJ 07102
    Counsel for Third-Party Defendant Eckerd Corporation d/b/a
    Brooks/Eckerd Corporation

**IRENAS,** Senior District Judge:

**I.**

Presently before the Court is the Motion to Dismiss the Third-Party Complaint or, Alternatively, to Stay All Proceedings on the Third-Party Complaint and Compel Arbitration by Third-Party Defendant Eckerd Corporation d/b/a Brooks/Eckerd Corporation ("Eckerd").[1] For the reasons set forth below, the present motion shall be granted in part and denied in part.

1. Any claim of J&S alleged to arise from ERISA or the MPPAA is dismissed on the merits.

2. Any claim of J&S based on state law, including contract, shall not be dismissed.

3. All remaining state law claims shall be sent to arbitration and the Third Party Complaint shall be dismissed.


**II.**

Plaintiff William J. Einhorn, Administrator of the Teamsters Pension Trust Fund of Philadelphia & Vicinity (the "Pension Fund"),[2] brought a three-count complaint against Defendants J&S, Inc. ("J&S"), Bristol Consolidators, Inc., Ghaznavi Investments,

---

[1] This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 and 29 U.S.C. §§ 1132 and 1451.

[2] The Pension Fund is an "employee pension benefit plan" within the meaning of Section 3(2)(A) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(2)(A), and a "multiemployer plan" within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37).

Inc., G&G Investments, Inc.,[3] and John J. Ghaznavi seeking recovery of sums to satisfy pension withdrawal liability.[4]  Count One asserts a claim for pension withdrawal liability against J&S based on a series of collective bargaining agreements with General Teamsters, Chauffeurs and Helpers Local Union No. 470, I.B.T. ("Local 470") pursuant to which J&S was to make monthly contributions to the Pension Fund on behalf of J&S's employees represented by Local 470.  (Complaint ¶ 12.)[5]  Count Two asserts a claim for pension withdrawal liability against J&S, Bristol Consolidators, Inc., Ghaznavi Investments, and G&G Investments, Inc., on the basis that they constitute one "employer" for purposes of J&S's withdrawal liability because they were all under "common control" as defined in Section 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1), on the date that J&S allegedly withdrew

_____

[3] G&G Investments, Inc. is a debtor in liquidation proceedings under Chapter 7 of the Bankruptcy Code, and thus, the claims against this defendant are automatically stayed pursuant to Section 362(a) of the Bankruptcy Code.

[4] Einhorn is a fiduciary of the Pension Fund within the meaning of Section 3(21) of ERISA, 29 U.S.C. § 1002(21).  As such, Einhorn assessed J&S with withdrawal liability.  Upon receiving notice, J&S did not take any action pursuant to § 1399(b)(2)(A) to challenge Einhorn's assessment.  Because J&S waived its administrative remedies, Einhorn is permitted to bring suit in this Court to collect the assessment pursuant to § 1401(b).

[5] Einhorn alleges that, because J&S has effectuated a complete withdrawal from the Pension Fund, J&S owes $723,824.04 in withdrawal liability plus liquidated damages to the Pension Fund. (Complaint ¶ 14.)

3

from the Pension Fund.  (Complaint ¶ 22.)  Finally, in Count
Three, Einhorn requests that the Court impose a constructive
trust on the assets of John J. Ghaznavi for those funds that
should have been used to pay the withdrawal liability.[6]
(Complaint ¶ 29.)

In response, Defendants filed an answer and third-party
complaint against Eckerd, and subsequently filed a First
Amendment to the Third-Party Complaint (the "Third-Party
Complaint").  According to the Third-Party Complaint, the
relationship between Thrift Drug, the predecessor-in-interest to
Eckerd, and J&S began in the early 1970s when Thrift Drug agreed
to finance the original start-up of the J&S business.[7]  (Third-
Party Complaint ¶ 13.)  Thrift Drug sought to extract itself from
the "day-to-day relationship" with the Teamsters Union, and thus,
it agreed to pay for all costs of the J&S operation, including
those related to the Union, in exchange for J&S's operation of
the trucking business for Thrift Drug.  (*Id.* ¶ 14.)  From the
early 1970s to February 2006, J&S states that it "stood in the
shoes of Thrift and Eckerd with respect to the [Teamsters Union],

_____

[6] Ghaznavi serves as the President of J&S, Bristol, Ghaznavi
Investments, and G&G. (Defendants' Answer ¶ 28.)

[7] In 1996, Eckerd merged with Thrift Drug and assumed the
contractual and business relationship with J&S.  (Third-Party
Complaint ¶ 22.)  Brooks Pharmacy and Eckerd later merged in
2004, and the merged entity, the Brooks/Eckerd Corporation, also
continued the relationship with J&S.  (*Id.* ¶ 23.)

4

receiving orders and payments from Eckerd to be implemented with and paid to the Teamsters Union." (*Id.* ¶ 15.)

J&S asserts that, prior to executing any collective bargaining agreement with Local 470, it submitted such agreements directly to Thrift Drug, "which in turn approved the concepts [] and/or language."[8] (*Id.* ¶ 18.)  Thus, J&S alleges that Thrift Drug was aware that contributions to the Pension Plan were part of J&S's reasonable costs of doing business with Thrift Drug. (*Id.* ¶ 19.)  Further, J&S states that Thrift Drug paid J&S all contributions due under the collective bargaining agreements for J&S's Local 470 employees, and that J&S then submitted such contributions to Local 470.  (*Id.* ¶ 20.)  J&S asserts that both the procedure for approving collective bargaining agreements as well as the payment of union member contributions to J&S continued after Thrift Drug merged with Eckerd.  (*Id.* ¶¶ 24-27.) Neither Thrift Drug nor Eckerd were named parties to the collective bargaining agreement between J&S and Local 470 that covered the period from May 1, 2003, to April 30, 2006.  (Eckerd

---

[8] J&S asserts that Thrift Drug's approval of contemplated collective bargaining agreements with any union was part of the parties' "historic business practice and contract." (Third-Party Complaint ¶ 16.)  J&S also asserts it "received direction, advice and approval from Thrift Drug as to any significant or major decisions on labor relations policies and management union relations."  (*Id.*)  The parties have not provided the Court with any of the original agreements between J&S and Thrift Drug.

56.1 Stat ¶¶ 5-6; Rosen Aff., Ex. A.)[9]

During this time period, on February 11, 1992, Thrift Drug notified J&S that it sought to terminate the services of J&S at Thrift Drug's Atlanta Distribution Center.  (Eckerd 56.1 Stat. ¶ 8.)  As a result of this termination, J&S and Thrift Drug simultaneously executed two agreements on October 30, 1996, a Settlement Agreement and Mutual Release,[10] effective immediately ("Settlement Agreement"), and a Transportation Agreement, effective September 1, 1995 ("Transportation Agreement").[11]

The Settlement Agreement provided that the "execution of the Transportation Agreement shall be a condition precedent to the effectiveness" of the Settlement Agreement.  (Rosen Aff., Ex. B.)  Likewise, the Transportation Agreement stipulated that "this Agreement is entered into pursuant to the provisions of the [Settlement Agreement] executed by the parties simultaneously herewith."  (Rosen Aff., Ex. C.)

---

[9] References to "56.1 Stat." and "Rosen Aff." pertain to the Statement of Material Facts and Affirmation of David Rosen submitted by Eckerd in support of this motion.

[10] The Settlement Agreement represented a complete settlement of any disputes relating to the disputes concerning the Atlanta facility.  (Rosen Aff., Ex. B.)  The Settlement Agreement also terminated a January 2, 1973 agreement that previously governed the relationship between J&S and Thrift Drug. (*Id.*)

[11] Both agreements stipulated that the agreement was "binding upon and inures to the benefit of the parties hereto and their respective successors in interest, assigns and legal representatives."  (Rosen Aff., Exs. B & C.)

Pursuant to the Transportation Agreement, J&S agreed to provide motor carrier services to Thrift Drug for the transportation of general commodities. (Third-Party Complaint ¶ 12, Ex. A.) The Transportation Agreement was "to continue for a period of ten (10) years, and annually thereafter, unless and until terminated, with or without cause, by either party upon not less than six (6) months prior written notice." (Rosen Aff. Ex. C.) The parties executed two amendments to the Transportation Agreement on February 28, 2000, effective September 5, 1999, and April 15, 2003, effective January 1, 2003, respectively. (Rosen Aff. Ex. D & E.)

The Settlement Agreement has two provisions related to pension withdrawal liability. The first, "Pension Withdrawal Liability" provides the following:

> J&S is a participant in certain Employer-Teamsters Union jointly trusted multi-employer pension plans. J&S and Thrift warrant and represent that they have in the past and will continue to use their respective best efforts to see that no pension withdrawal liability is incurred . . . . If, despite the diligent efforts of J&S to avoid pension withdrawal liability within the meaning of ERISA and MPPAA, actions by Thrift . . . result in J&S incurring withdrawal liability, the parties agree to resolve the matter on the following basis: One of the components of the "buy-out" liability of $1,520,000 as provided in subparagraph 3.2 is the sum of $390,000 attributable to pension withdrawal liabilities. This sum is to be amortized at the rate of $3,250 per month for each full month that J&S continues to provide trucking services to Thrift pursuant to the Transportation Agreement and is included in the total monthly amortization amount of $12,666.66 provided for in subparagraph 3.2a. If, as a result of any action by Thrift, J&S incurs any withdrawal liability, Thrift will

> promptly pay to J&S the amount of the withdrawal
> liability or an amount equal to the unamortized portion
> of the buy out liability attributable to pension
> withdrawal liabilities as of the date on which such
> liability is payable by J&S, whichever amount is less.
> In such event, the monthly amortization amount provided
> for in subparagraph 3.2 shall be reduced pro-rata to
> reflect the aforesaid payment.

(Rosen Aff., Ex. B.)  Subparagraph 3.2, "Buy-Out Liability,"

provides that the parties agree to a buy-out liability of

$1,520,000 paid by Thrift Drug to J&S as a means of resolving all

liabilities.  (*Id*.)  For each month that J&S provides trucking

services to Thrift Drug pursuant to the Transportation Agreement,

the buy-out liability is reduced by $12,666.66.  (*Id*.)

Subparagraph 3.2 is explicitly made subject to the terms of the

Pension Withdrawal Liability provision.  (*Id*.)[12]

Both the Settlement Agreement and the Transportation

Agreement contain an identical arbitration clause, calling for

binding arbitration of "any dispute under this Agreement" in

front of a single arbitrator in accordance with American

Arbitration Association procedures.  (Rosen Aff., Exs. B & C.)

The parties stipulated that there is no right to appeal the

---

[12] The Court acknowledges that the parties dispute whether
the provisions pertaining to withdrawal liability in the
Settlement Agreement applies only to withdrawal liability
incurred as a result of closing the Atlanta facility, or any
withdrawal liability incurred in the future.  While this dispute
may impact the merits of any claims arising out of the
termination of their relationship, it is not necessary to resolve
for the purposes of this Motion.

decision of the arbitrator.  (*Id.*)

Although Eckerd sought to terminate the Transportation Agreement in February 2005, as of that September, Eckerd and J&S had subsequently agreed to extend their business relationship. (Third-Party Complaint ¶¶ 45-46.)  While it appears that such an agreement was not memorialized in writing, J&S asserts that Eckerd agreed to a three-year extension of the Transportation Agreement wherein Eckerd continued to pay J&S for all "known and reasonable costs," including all Pension Plan contributions to Local 470 and withdrawal liability.  (*Id.* ¶¶ 46-50.)[13]  On January 23, 2006, Eckerd provided notice to J&S of its intent to terminate the Transportation Agreement, effective in thirty days. (*Id.* ¶ 37.)  By letter dated April 5, 2007, the Pension Fund notified J&S of its claim for withdrawal liability.  (Eckerd 56.1 Stat. ¶ 23.)  It is unclear whether J&S responded to such notice, although it has not initiated statutory arbitration as a means of contesting its liability.  (*Id.*)

Defendants filed a seven-count third-party complaint against Eckerd for the following claims:  (1) breach of contract arising from Eckerd's failure to provide the requisite six months notice

---

[13] The parties dispute whether the relationship that continued into the beginning of 2006 was in fact based on an extension of the existing contract, or on a new contract altogether.  While this dispute may impact the merits of any claims arising out of the termination of their relationship, it is not necessary to resolve this dispute for purposes of this Motion.

prior to termination of the Transportation Agreement (Count I);
(2) breach of contract arising from Eckerd's commitment to pay
all reasonable costs, including withdrawal liability, during the
three-year extension of the Transportation Agreement (Count II);
(3) promissory estoppel based on Eckerd's promise to extend the
contract for at least three years and pay all known and
reasonable costs (Count III); (4) breach of the Settlement
Agreement arising from Eckerd's representation that it would pay
J&S the amount of any withdrawal liability (Count IV); (5)
liability under the Multiemployer Pension Plan Amendments Act
("MPPAA") as a joint employer (Count V); (6) breach of contract
and breach of the duty of good faith based on Eckerd's
negotiations with another trucking company (Count VI); and (7)
breach of contract/indemnification arising out of the
indemnification clause in the Transportation Agreement for the
amount of any withdrawal liability imposed (Count VII).

## III.

Rule 12(b)(6) of the Federal Rules of Civil Procedure
provides that a court may dismiss any part of a complaint for
"failure to state a claim upon which relief can be granted."[14]

---

[14] Eckerd asks that the Court convert its Fed. R. Civ. P. 12
(b)(6) motion to dismiss into one for summary judgment under Fed.
R. Civ. P. 56. The general rule is stated in Fed. R. Civ. P.
12(d): "If, on a motion under Rule 12(b)(6) . . . matters
outside the pleadings are presented to and not excluded by the

In considering a Rule 12(b)(6) motion, the Court accepts as true all well pleaded factual allegations contained in the complaint and draws all reasonable inferences from such allegations in the light most favorable to the plaintiff.  *See Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 653 (3d Cir. 2003).  To survive a Rule 12(b)(6) motion, "a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'"  *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) (internal citations omitted)).

---

court, the motion must be treated as one for summary judgment under Rule 56."

> However, an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.  The rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint -- lack of notice to the plaintiff -- is dissipated where plaintiff has actual notice and has relied upon these documents in framing the complaint.

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)(internal citations and quotations omitted).  The exception applies here.  Of the five documents submitted as exhibits to the Affidavit of David Rosen, two of these documents, the Transportation Agreement and the Settlement Agreement, were already attached to the Third-Party Complaint.  The remaining documents, the collective bargaining agreement between J&S and Local 470 and the two amendments to the Transportation Agreement and Settlement Agreement, are referenced in and integral to the underlying Third-Party Complaint.  Thus, the Court will not treat this motion as one for summary judgment.

**IV.**

**A.**

Congress enacted the MPPAA in order to "'protect plans from the adverse consequences that resulted when individual employers terminated their participation in, or withdrew from, multiemployer plans.'" *Flying Tiger Line v. Teamsters Pension Trust Fund*, 830 F.2d 1241, 1243 (3d Cir. 1987) (quoting *Pension Benefit Guar. Corp. v. R. A. Gray & Co.*, 467 U.S. 717, 722 (1984)). "The act sets rules for determining responsibility for a plan's unfunded liabilities when an employer withdraws from the plan and for collecting such liability." *Doherty v. Teamsters Pension Trust Fund of Philadelphia & Vicinity*, 16 F.3d 1386, 1388 (3d Cir. 1994). An employer completely withdraws from a multiemployer plan when it either "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a).

Pursuant to MPPAA procedures, when an employer withdraws from a multiemployer plan, the plan sponsor is to notify the employer of the amount of the liability and schedule for liability payments and demand payment in accordance with such schedule. 29 U.S.C. § 1399(b)(1). Within ninety days of receiving notice, the employer may ask the plan sponsor to

12

undertake a review of the employer's liability, identify inaccuracies in the determination, and furnish additional relevant information to the plan sponsor. 29 U.S.C. § 1399(b)(2)(A). Upon a "reasonable review" of the dispute, the plan shall provide notice to the employer of the plan's decision. 29 U.S.C. § 1399(b)(2)(B).

The MPPAA further provides that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 4201 through 4219 [29 U.S.C. §§ 1381-1399] shall be resolved through arbitration." 29 U.S.C. § 1401(a). Arbitration may be initiated by either party, although it must be done within sixty days from either (1) the date the plan gives notification to the employer under 1399(b)(2)(B), or (2) one hundred twenty days from the date the employer requests a review under § 1399(b)(2)(A). 29 U.S.C. § 1401(a)(1). Within thirty days of an arbitrator's decision, a party may file an action in district court "to enforce, vacate, or modify the arbitrator's award." 29 U.S.C. § 1401(b)(2).[15]

If an arbitration proceeding is not commenced in this manner, then the amounts demanded by the plan sponsor shall be due and owing pursuant to the plan's schedule, and the plan sponsor may bring an action to collect payment in state or

---

[15] An employer is to begin making payments according to the plan's schedule even where it seeks to dispute the amount owed in arbitration. 29 U.S.C. § 1401(d).

13

federal court.  29 U.S.C. § 1401(b).

This intricate and detailed procedure supports the underlying goal of the MPPAA to bring about fast and efficient resolution to disputes over withdrawal liability.  *See Flying Tiger Line*, 840 F.2d at 1244 ("Provisions for the quick and informal resolution of withdrawal liability disputes are an integral part of MPPAA's statutory scheme.").

### B.

Although arbitration is typically a requisite step to contest a pension fund's claim of withdrawal liability, the Third Circuit and other courts have carved out an exception to this general rule, allowing a district court in limited circumstances to determine an entity's "employer" status.  *Galgay v. Beaverbrook Coal Co.*, 105 F.3d 137, 142 (3d Cir. 1997); *Doherty*, 16 F.3d at 1390-91; *Flying Tiger Lines*, 830 F.2d at 1250-51.  In making this exception, the Third Circuit has "distinguished between disputes over whether an entity has ceased to be an employer within the meaning of MPPAA, which must be resolved in arbitration, and disputes over whether an entity has ever become an employer, which must be resolved in the courts."  *Id*. at 141. The rationale for allowing a district court to make such a determination is that "an entity which has never been an employer within the meaning of the MPPAA is not subject to the

14

arbitrator's jurisdiction, since 29 U.S.C. § 1401(a)(1) only mandates arbitration for disputes between 'an *employer* and the plan sponsor.'"  *Id.* at 142 (quoting *Doherty*, 16 F.3d at 1390). *See also Korea Shipping Corp. v. New York Shipping Ass'n*, 880 F.2d 1531, 1536 (2d Cir. 1989) ("We conclude that the definition of who is an employer for purposes of determining withdrawal liability under the MPPAA is one that in the final analysis must be left to the courts."); *Flying Tiger Line*, 830 F.2d at 1251.

However, this exception is not a means to bypass the procedures described above.  *See* Part IV.A *supra*.  Rather, in the cases where the Court has permitted a judicial determination of an entity's status as an employer, the assessed party has already challenged the fund's determination pursuant to § 1399(b)(2)(A), and in some cases also initiated arbitration.  *See*, *e.g.*, *Galgay*, 105 F.3d at 138;[16] *Doherty*, 16 F.3d at 1388-89; *Flying Tiger Line*, 830 F.2d at 1245-46; *Global Leasing Inc. v. Henkel Corp.*, 744 F. Supp. 595, 597 (D.N.J. 1990).  *Galgay* reaffirms the proposition that while a party is entitled to a judicial determination as to whether they were ever an employer for MPPAA purposes, seeking such a determination does not alleviate the need for compliance with the statutory framework.

---

[16] While the Third Circuit does not explicitly note that the assessed parties followed the § 1399(b)(2)(A) procedure, they did initiate arbitration pursuant to § 1401--a prerequisite to which is following the aforementioned procedures.

**V.**

In support of its Motion, Eckerd argues that, because J&S failed to initiate and assert a joint employer defense in statutorily mandated arbitration, J&S's joint employer claim against Eckerd must be dismissed.  Eckerd further argues that J&S's additional common law claims for breach of contract and promissory estoppel must be dismissed based on preemption by MPPAA.  Should the Court fail to dismiss J&S's common law claims based on preemption, Eckerd seeks to stay all court proceedings against Eckerd and compel J&S to arbitrate those claims pursuant to the arbitration clauses contained in the Settlement Agreement and Transportation Agreement.

**A.**

Upon receiving notice from Einhorn that the withdrawal liability was due, J&S had limited options as to how to proceed while remaining in compliance with the MPPAA and the Third Circuit's jurisprudence.

J&S's first option was to comply with the aforementioned procedures set forth in 29 U.S.C. § 1399(b)(2)(A), and if dissatisfied with the result, to initiate arbitration in compliance with § 1401(a), following the prescribed timetable. Were it to have pursued that course of action, J&S could have

16

brought to Einhorn's attention its belief that Eckerd was a co-employer.  Such information is clearly the type of information intended to be conveyed under §§ 1399(b)(2)(A)(i) and (iii). Furthermore, as the party with the contractual relationship and history with Eckerd, J&S was in a peculiarly good position to have information that might have otherwise been unavailable to Einhorn when the initial assessment was made.  In that situation, had Einhorn refused to assess Eckerd, J&S would have had the option of commencing arbitration pursuant to § 1401(a), and coming to court to request an order that Eckerd, or any other third-party, be added to the arbitration even in the event that Einhorn did not consider them an employer under the MPPAA.  *See Vare v. Philadelphia Electric Co.*, No. 93-1341, 1994 WL 8144, *4 (D.N.J. Jan. 12, 1994).

Another option available to J&S, in accordance with the Third Circuit's holding in *Galgay*, would have been to file in District Court for a declaratory judgment to determine whether it, or another person, was in fact an employer as defined by the MPPAA.  *See Galgay*, 105 F.3d at 141.  However, as discussed above, Part IV.B *supra*, this option must be pursued either concurrently with arbitration (if liability to the union is contested) or commenced prior to the end of the permissible period for arbitration (if liability to the union is conceded, but the liability of an additional party as an "employer" is

alleged).

Their third option would have been to pay the withdrawal liability, and then, in a separate action seek indemnification or other common-law claims against Eckerd or another third-party who they felt owed them money. *See Vare*, 1994 WL 8144, *4.

However, J&S did not follow any of these courses. Rather, J&S did not contest the assessment of withdrawal liability pursuant to § 1399(b)(2)(A)[17]. Furthermore, J&S waited until Einhorn filed a collection action pursuant § 1401(b) against it to contest that it owed the withdrawal liability or that Eckerd should also be considered an "employer."[18] The Third Circuit has repeatedly held that, "[a]n employer will waive its statutory rights to dispute aspects of the Fund's liability determination where arbitration is not demanded within the time period prescribed by the statute." *Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc.-Pension Fund v. Kero Leasing Corp.*, 377 F.3d 288, 295 n.5 (3d Cir. 2004) (quoting *Barker & Williamson*, 788 F.2d at 129).[19]

---

[17] As such, J&S similarly waived its right to arbitration pursuant to § 1401(a).

[18] In fact, at oral argument, J&S conceded that it had no intention to contest the amount of the assessment or the fact that J&S was correctly determined to be an "employer."

[19] However, at oral argument, J&S raised for the first time the theory that the history of the relationship indicates that Eckerd was the original "employer," and that Eckerd would have to demonstrate that it ceased to be an "employer" when J&S took over

**B.**

In *Global Leasing Inc. v. Henckel Corporation*, 744 F. Supp. 595 (D.N.J. 1990), Judge Lifland held that the court could entertain a declaratory judgment action by a party assessed as an employer seeking a determination that another party should also be deemed an employer.  However, the Court also held that it did not have the authority to order such third party to make payments to the pension fund should it be found to be an employer, since only the MPPAA arbitrator could issue such an order.  *Global Leasing*, 744 F. Supp. at 599.

Although not specifically pleaded in the Third Party Complaint, were this Court to construe Count V as seeking a declaratory judgment that Eckard was an employer for MPPAA purposes, that claim would still be dismissed.[20]  In *Global Leasing* the employer assessed for withdrawal liability

---

as the carrier.  Under *Galgay*, the determination that Eckerd ceased to be an "employer" would have needed to be raised in arbitration.  However, because J&S failed to initiate arbitration, they similarly waived the opportunity to claim that Eckerd was an original "employer" that may have later ceased to have been an "employer."

[20] Failure to specifically plead seeking this relief would itself be sufficient grounds to justify dismissal.  However, for the reasons discussed below, even if J&S had been given leave to amend seeking this specific relief, such amendment would be futile.  *See Philips v. County of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008) (district courts must provide plaintiffs whose claims are subject to Rule 12(b)(6) dismissal leave to amend unless it would be inequitable or futile).

immediately challenged the assessment within the time frames set forth in the MPPAA and followed all of the prescribed procedures prior to seeking a declaratory judgment.[21]  Similarly, in all the instances where the Third Circuit has acknowledged a district court's ability to make a determination of employer status, the statutory procedures were followed as well.  *See* Part IV.B *supra*.

Furthermore, "it has been held that an assessed employer's failure to raise a 'joint employer' theory by way of arbitration under section 1401 of the MPPAA precludes such an assertion in a district court action, even on a claim by that employer for reimbursement or indemnity from a third party."  *Crown Paper Board Co., Inc. v. Kappa Board, Inc.*, No. 87-0194, 1991 WL 136214, *6 (E.D.Pa. July 18, 1991) (citing *Combs v. Leishman*, 691 F. Supp. 424 (D.D.C. 1988).

While the Third Circuit has expanded the role of the courts in ERISA cases, and it is now the court's responsibility to determine whether a particular entity is an "employer," the appropriate time for the employer named by the union to assert that another party is a sole or joint "employer" is prior to the expiration of the time to commence arbitration.  The Court

---

[21] Global timely made all interim payments, requested a review of the Fund's determination, notified the Fund of its position that there was a third party who was actually the party responsible for the withdrawal liability, waited for the Fund to refuse, and initiated arbitration prior to seeking a declaratory judgment that the third party was indeed an "employer."  *Global Leasing*, 744 F. Supp. at 597.

recognizes that "the purpose of MPPAA is best served by exposing all parties that are 'employers' to their legitimate withdrawal liability." *Central Pennsylvania Teamster's Pension Fund v. Service Group, Inc.*, 645 F. Supp. 996, 998 (E.D.Pa. 1985).  In doing so, however, one cannot overlook the need to seek a fast and efficient resolution.  Simply because the determination of who is properly an "employer" under MPPAA is left to the courts, does not release an assessed party of the obligation to comply with the statutory framework.  When an assessed party fails to comply, as J&S did here, they are not entitled to bring suit against a third party seeking a declaratory judgment that it too is an employer.[22]

### C.

An employer who is assessed by a union pension fund for withdrawal liability has no independent cause of action under ERISA or the MPPAA to sue a third-party for contribution or indemnification on the theory that such party is properly the sole or joint employer for purposes of those statutes.  Nowhere

---

[22] It is important to note that this holding--that an assessed employer may not seek a declaratory judgment against a third party that it too is an employer--is limited to the facts of the present case where J&S failed to comply with any of the available procedures to contest the assessment of liability under §§ 1399(b)(2)(A) and 1401(a).  Furthermore, the Court makes no comment on how it would rule if Einhorn were to bring a claim against Eckerd for a portion of the withdrawal liability.

in the statute is it suggested that such a cause of action is available.[23]  *See Texas Instruments, Inc. v. Radcliff Materials*, 451 U.S. 630, 646 (1981) (joint and several liability of parties does not create a federal law right of contribution among them). Neither may this Court imply such a cause of action when Congress does not explicitly allow it to do so.  *Northwest Airlines, Inc. v. Transport Workers Union of Am.*, 451 U.S. 77, 97 (1981) ("In almost any statutory scheme, there may be a need for judicial interpretation of ambiguous or incomplete provisions.  But the authority to construe a statute is fundamentally different from the authority to fashion a new rule or to provide a new remedy which Congress has decided not to adopt.").  As the Court concluded in *Vare*:

> "It is one thing to permit an assessed employer to defend itself by compelling another alleged to be liable for the withdrawal payments to the pension fund to join in arbitration proceedings to further the objective of the statute to protect plan participants by exposing to direct liability all who may be liable to the plan.  It is quite a different matter to permit an employer effectively to circumvent the process mandated by Congress for the determination and allocation of withdrawal liability by entertaining an ERISA cause of action for indemnification or contribution by and purely for the benefit of one employer against another after MPPAA liability to the pension fund has been satisfied."

---

[23] While on the face of the Third Party Complaint, it appears that J&S is seeking payment directly from Eckerd under the MPPAA, during oral argument J&S conceded that it does not have a direct cause of action for contribution or indemnification under the MPPAA.

*Vare*, 1994 WL 8144, *3.

**D.**

While ERISA preemption is very broad, the Third Circuit has held that there is only preemption if the state law claim "relates to" an ERISA plan. "[A] rule of law 'relates to' an ERISA plan 'if it is specifically designed to affect employee benefits plans, if it singles out such plans for special treatment, or if the rights or restrictions it creates are predicated on the existence of such a plan.'" *Ragan v. Tri-County Excavating, Inc.*, 62 F.3d 501, 510-11 (3d Cir. 1995) (quoting *United Wire, Metal and Machine Health and Welfare Fund v. Morristown Memorial Hospital*, 995 F.2d 1179, 1192 (3d Cir. 1993)).

In the present case, Counts I-IV, VI, and VII all assert claims which arise not under the MPPAA, but rather under state law. While a portion of the damages requested are for the withdrawal liability incurred by J&S, J&S is seeking such damages based on state law theories such as breach of contract and promissory estoppel. These claims are based on rights alleged to flow from the Transportation Agreement and the Settlement Agreement between Eckerd and J&S. "The refusal of a third party to honor the request of an assessed employer to reimburse it for withdrawal payments pursuant to a . . . provision in a contract

between them is not an act 'under' MPPAA." *Vare*, 1994 WL 8144, *4.  We know of no reason why ERISA would preempt a contractual agreement between a vendor of goods or services and a purchaser which compensates the vendor for withdrawal liability should the purchaser terminate the relationship.

It is not uncommon for a vendor of goods or services to rely solely or largely on the business of one client to sustain the vendor.  In such cases, it is foreseeable that if that client were to choose to terminate the relationship, it would do considerable harm to the financial stability of the vendor, or even force them out of business.  It may also lead the vendor to incur significant expenses, such as withdrawal liability, without the means to pay them.  As such , many contracts in these relationships provide for such a situation, as is the case here.  J&S was created for the purpose of providing trucking services to Thrift.[24]  It was foreseeable at the time the contract was entered into, that if Thrift, or its successors, were to terminate the relationship, considerable cost would be incurred by J&S.  The Settlement Agreement arose out of just such a situation, and provided that Thrift, or its successors, would pay J&S a sum fixed by the contract, based in part on the length of time that the contract is in effect before it is terminated.

---

[24] Thrift is Eckerd's predecessor-in-interest.  *See supra* note 7.

24

(Rosen Aff., Exs. B & C.)[25]   Indeed, this type of arrangement increases the chances that withdrawal liability will be paid by financially strengthening the party most likely liable as an "employer."  Such a result is consistent with ERISA's public policy.  State law breach of contract claims were raised in both *Global Leasing* and *Vare.*  However, neither Court even addressed the possibility that those claims might be preempted by the MPPAA.  Rather, the plaintiffs were permitted to continue to pursue those claims.  *Global Leasing*, 744 F. Supp. at 601 (denying summary judgment and allowing breach of contract claim to proceed); *Vare*, 1994 WL 8144 at *4 (dismissing case without prejudice "to pursue any state law claim for indemnification, restitution or breach of contract that may be appropriate.").

### E.

The remaining claims by J&S against Eckerd are part of the same underlying transaction or occurrence, namely the withdrawal of J&S from the multi-employer plan, and therefore, they remain within the Court's jurisdiction.  28 U.S.C. § 1367(a).  *See*

_____

[25] As indicated in note 11 *supra*, the parties dispute whether the withdrawal liability provision is limited to withdrawal liability arising out of the closing of the Atlanta facility.  However, the fact that the agreement nonetheless contained a provision contractually providing for how potential withdrawal liability would be dealt with indicates an awareness on the part of both J&S and Thrift of the potential for withdrawal liability and the ability to contractually provide for its impact.

*United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966); *Ambromovage v. United Mine Workers of Am.*, 726 F.2d 990 (3d Cir. 1984).  *See generally* 3 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶¶ 14.40-14.41[4](c).[26]

### F.

Because the issue of whether this dispute is arbitrable is connected to a transaction involving interstate commerce, the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (2008) (the "Arbitration Act"), governs.  *See Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005).  The Arbitration Act reflects the national policy favoring the arbitration of disputes where parties have entered an arbitration agreement.  *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443-44 (2006).  Pursuant to 9 U.S.C. § 3, a court should stay the proceedings pending arbitration.  Further, under 9 U.S.C. § 4, a party may seek to compel arbitration of claims falling under the arbitration agreement.

"A motion to compel arbitration calls for a two-step inquiry into (1) whether a valid agreement to arbitrate exists and (2) whether the particular dispute falls within the scope of that

---

[26] "The Federal Arbitration Act itself does not create federal question jurisdiction."  *Dluhos v. Strasberg*, 321 F. 3d 365, 376 n.1 (3d. Cir 2003) (citing *Roadway Package Sys. v. Kayser*, 257 F.3d 287, 291 n. 1 (3d Cir.2001)).

agreement." *Trippe Mfg. Co.,* 401 F.3d at 532. "When determining both the existence and the scope of an arbitration agreement, there is a presumption in favor of arbitrability." *Id.* at 532; *see also AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986); *United Steelworkers of Am. v. Rohm & Haas, Inc.*, 522 F.3d 324, 331 (3d Cir. 2008).

J&S and Eckerd have agreed to a broad arbitration clause that encompasses "any dispute under this Agreement." The Court holds that the remaining claims for breach of contract or promissory estoppel fall within the range of arbitrable issues contemplated by the arbitration clause.

## VI.

For the reasons stated above, Eckerd's Motion to Dismiss the Third-Party Complaint or, Alternatively, to Stay All Proceedings on the Third-Party Complaint and Compel Arbitration will be granted. Eckerd's Motion to Dismiss Defendants' MPPAA joint employer claim under Count V is granted. Furthermore, Eckerd's Motion to Dismiss Defendants' breach of contract, promissory estoppel, and breach of contract/breach of duty of good faith claims under Counts I, II, III, IV, VI, and VII, is granted, but only to the extent it seeks to compel arbitration of these claims pursuant to the Settlement and Transportation Agreements. Eckerd and Defendants are hereby ordered to arbitrate these claims

pursuant to the arbitration clauses in the Settlement Agreement and Mutual Release and the Transportation Agreement, dated October 30, 1996..  The Court will issue an appropriate Order.


Dated: September 22, 2008


 s/   Joseph E. Irenas
**Joseph E. Irenas, S.U.S.D.J.**

28